THE PRESIDENT, DIRECTORS, AND COMPANY OF THE LECHMERE
BANK, by LEWIS HALL & others *vs.* EDMUND BOYNTON &
others.

THE PRESIDENT, DIRECTORS, AND COMPANY OF THE LECHMERE
BANK, by EDMUND BOYNTON & others *vs.* LEWIS HALL &
others.

A statute incorporated three persons named, their associates and successors, by the
name of the "President, Directors, and Company of the Lechmere Bank."
*Held*, that by the word "associates," the legislature *primâ facie* intended those
who were associated with the three persons named as petitioners for the bank,
praying that they might be so incorporated, and upon the evidence in the case
could not be intended to include other persons who did not sign the petition for
the bank, but who merely subscribed for stock in the same in sundry books pre-
pared and circulated at the meeting when the enterprise originated, and where the
petition to the legislature was drawn up and signed.

THESE were applications for leave to file informations in the
nature of a *quo warranto* under *St.* 1852, *c.* 312, §§ 42, 50, by
parties respectively claiming the franchise granted by an act
incorporating the Lechmere Bank, at East Cambridge. *St.*
1853, *c.* 241.

In the first-named case, the following petition was filed
during the March term of this court in Suffolk county, in the
year 1853.

" To the honorable the justices of the supreme judicial
court of the commonwealth of Massachusetts : Humbly
show your applicants, the President, Directors, and Company
of the Lechmere Bank, that by an act of the legislature
of said commonwealth, approved on the 28th of April now
last past, Amory Houghton, Edmund Boynton, Frederic Kid-
der, and their associates and successors, were incorporated by
the name of the President, Directors, and Company of the
Lechmere Bank, to be located in East Cambridge, in the
county of Middlesex, being a part of the city of Cambridge
That afterwards, at a meeting of the petitioners for said act,
called and notified in the manner provided by law, and held on
the fourth day of June current, the corporation created by said

act was legally organized, and Amory Houghton, Lewis Hall, Francis Draper, Thomas Dana, Samuel Slocumb, all of Cambridge aforesaid, and K. S. Chaffee, of Somerville, in said county, and Amos C. Sandborn, of Boston, in the county of Suffolk, were duly chosen directors thereof. And thereafterwards, to wit, on the 10th of June instant, the said board of directors elected Lewis Hall president of said bank.

" And so your petitioners aver, that they are a corporation legally established and organized, and have the right to hold, and exercise and enjoy the franchise, powers and privileges granted by said act of incorporation, undisturbed, and without molestation, interference, or intrusion, and no persons other than the above-named Hall, Houghton, Dana, Draper, Slocumb, Chaffee, and Sandborn, have any right in law to hold or exercise the office of directors of said corporation. And no person, other than the said Hall, has any right in law to hold or exercise the office of president of said corporation.

" And they further represent, that Edmund Boynton and J. M. Doe, both commorant of Lexington, in the said county of Middlesex, and Frederic Kidder, Caleb Hayden, and N. W. C. Jameson, all of Cambridge aforesaid, have illegally, and against the right of your applicants, intruded themselves into the office of directors of said Lechmere Bank, and have assumed to hold and exercise, and still do hold and exercise the rights, powers, and duties of directors of said bank, claiming the right so to do under the act of incorporation aforesaid.

" And the said Boynton has intruded himself into the office of president of said bank, and has assumed to hold and exercise, and still does hold and exercise the rights, powers and duties of president of said bank. And the said Boynton, as president, and the said Doe, Kidder, Jameson, and Hayden, as directors, have and still do, without right, exercise and enjoy the franchise granted by said act of incorporation Whereby the private right and interest of your petitioners and of the directors and members of said corporation are injured and put in hazard.

" Wherefore your petitioners pray for leave to file an infor

mation in the nature of a *quo warranto*, in which the above-named Edmund Boynton, Joseph M. Doe, Frederic Kidder, Caleb Hayden and N. W. C. Jameson, may be called upon to show by what right they have intruded themselves into the office of directors of said Lechmere Bank, and exercise and claim to exercise the rights, powers, and duties of that office, and that the said Boynton may be called upon to show, by what right he has intruded himself into the office of president of said bank, and claims to exercise the rights, powers, and duties of the said office, and that the said Boynton, as president, and the said Doe, Kidder, Hayden, and Jameson, as directors, may be called upon to show by what right they exercise and enjoy the franchise granted by said act of incorporation before mentioned.

" And your petitioners further ask that, until a hearing and final decision on said information shall be had, an injunction may issue against the said Boynton, forbidding him from exercising the rights, powers, and duties of president of said bank, and against the said Boynton, Doe, Kidder, Hayden, and Jameson, forbidding them from exercising the rights, powers, and duties of directors of said bank, and from enjoying the franchise granted by the act of incorporation before mentioned and for general relief.

" The President, Directors, and Company of the Lechmere Bank, by Lewis Hall, President, and Amory Houghton, Thomas Dana, Francis Draper, Samuel Slocumb, K. S. Chaffee, and A. C. Sandborn, Directors."

An order of notice issued on this petition, and the respondents appeared, and filed an answer setting forth the facts on which they relied in defence, and claiming the right to exercise the franchise in question, and the petitioners filed a replication.

A hearing was had before *Metcalf*, J. who granted leave to file the information, and an injunction in accordance with the prayer of the petition. The respondents then filed a similar petition also in the name " The president and directors of the Lechmere Bank, in their own behalf as well as that of said corporation," praying for leave to file an information against the

petitioners in the first case, and for an injunction. It was then agreed between the parties, that the judgment rendered as above stated should be stricken off and the injunction cancelled; that both applications should be referred by a single judge to the whole court at the October term, in Middlesex county; that the facts should be heard by a master and reported to the whole court, his report on the facts to be final, and that the decision of the court on the question of granting leave to file information, should settle the controversy, and decrees for releases be made to effect this result. But that if the full court should refuse to hear the applications and send the parties to a single judge, the record in the first case should be restored, with leave to the petitioners to file an information.

The case was accordingly referred to William J. Hubbard, Esq. master in chancery. And his report stated the following facts together with others not material to the final decision of the case :

On or about the 15th of January, 1853, the legislature then being in session, Frederic Kidder, Amory Houghton, Edmund Boynton, and Nathan W. C. Jameson, held a meeting at the Triton Insurance Office in Boston, for the purpose of taking preliminary steps towards the establishment of a bank in East Cambridge. At said meeting it was decided that a petition should be drawn up, and signed by the parties then present, and after being circulated for the purpose of obtaining additional signatures, should be presented to the legislature ; it was also further unanimously agreed at the same time, that books should be uniformly headed, and put in circulation by the several persons then present, for the purpose of obtaining subscribers to the undertaking.

A petition was prepared, substantially the same as that hereinafter set forth, and was signed at said meeting by said Edmund Boynton, Amory Houghton, and Frederic Kidder; and by general consent said petition was delivered to the said Houghton for the purpose of obtaining additional subscriptions.

At the same meeting, six books were prepared, for the purpose of obtaining subscriptions to the stock of the proposed

bank,—each of which had the same heading, and in the following words :

" We, the subscribers, agree to take the number of shares annexed to our names, individually, for the purpose of forming a banking association in East Cambridge, and agree to pay the same at such time, and in such instalments, as the board of directors, when chosen, shall specify."

At said meeting, a subscription was commenced on four of said books, and it was also agreed that each one of the four should take one of the books to procure subscriptions to the same, and that Lewis Hall, Francis Draper, and J. M. Doe, should be invited to take books for the like purpose. Inquiry was made by Jameson at said meeting, whether they could depend upon having all the books kept together, and it was agreed that subscribers to the books should stand alike.

One of the six books prepared at the Triton Office, together with two other books, afterwards prepared, were circulated by said Houghton, Lewis Hall, and Francis Draper, principally in East Cambridge.

The next day, or the next but one after the aforenamed meeting, Houghton met Boynton, and told him there was a word left out in the petition which they had signed, and he would have a new copy made. A new copy was prepared, and presented by Houghton to Boynton without any signature. Boynton requested Houghton to sign it first, which he did, and Boynton signed it next. Said petition, of which the following is a copy, was presented to the legislature.

" To the Honorable the Senate and House of Representatives of Massachusetts in General Court assembled.

" The undersigned, inhabitants of that part of the city of Cambridge, known as East Cambridge, would respectfully represent that the business of that place has, within a few years, greatly increased, more particularly the business of dealing in lumber, wood, and coal, as also the manufacturing of glass, stone, furniture, metals, and various other articles, and that it would be for the interest of the place, and the public generally, that a bank of deposit and discount be located there.

" And your petitioners would respectfully ask, that they may be incorporated for that purpose of establishing a bank there, with a capital of two hundred thousand dollars, with the same powers and privileges that have been granted to other banks in this commonwealth, and as in duty bound, will ever pray.    Cambridge, January 15, 1853."

Five of the persons who signed said petition, did not subscribe for stock in the proposed bank, and a large majority reside in East Cambridge, although some were residents of other places.    The said petition was referred by the legislature to the joint committee on banks and banking.    Some individuals, finding that a much larger amount of stock had been subscribed for in Boston than in East Cambridge, being desirous that the control of the proposed bank should be in the hands of persons residing or doing business in East Cambridge, caused a memorial to be prepared, addressed to the beforenamed committee; which was signed by several of the original petitioners, and also by other persons not petitioners, which memorial was presented to the committee, and was as follows :

" To the Joint Standing Committee on Banks and Banking in the Legislature of Massachusetts.

" Gentlemen,—The undersigned, citizens of Cambridge, and whose places of business is at East Cambridge, and whose names are borne on a petition now before the legislature for a bank with a capital of two hundred thousand dollars, to be located in East Cambridge, are of the opinion, upon more mature consideration, that a bank with one hundred thousand dollars will for the present accommodate the business of that village, and that it is desirable to have the proposed bank owned and managed by citizens of the place; and for the accommodation of the business of the place, they ask that the capital may be fixed at that sum."

The following counter memorial was also signed by others of the original parties, and by other parties, and was likewise presented to the committee.

" To the Honorable the Joint Standing Committee on Banks and Banking of the Legislature of Massachusetts.

" The undersigned, residents of East Cambridge, in the city of Cambridge, respectfully represent that a bank with a capital of two hundred thousand dollars, as prayed for by the original petition of A. Houghton and others, will best subserve the interests of the public, as well as those more directly concerned in the establishment of the bank. Cambridge, Feb. 9, 1853."

Both sets of subscribers were notified by the committee to attend before them, and were respectively heard by counsel in their behalf.

The eight subscription books hereinbefore mentioned, were produced before the committee, and were examined, it being a rule of the committee that a list of the subscribers, and the subscription books should in all cases be produced.

A great number of petitions was before the legislature, asking for the creation and increase of bank capital to a large amount. The committee of the legislature endeavored to reduce the amount as much as possible, and in the case of the Lechmere Bank, as the parties who appeared before the committee differed in their views as to the amount which they desired should be allowed them, the committee reported a bill " to incorporate the Lechmere Bank in Cambridge," with a capital of one hundred thousand dollars.

The only part of the act which is entitled "An act to incorporate the Lechmere Bank," material to this case, is a portion of the first section, which is as follows :

"Amory Houghton, Edmund Boynton, Frederic Kidder, their associates and successors, are hereby made a corporation, by the name of the president, directors, and company of the Lechmere Bank, to be established in that part of Cambridge called East Cambridge."

A notice signed by Amory Houghton, the person first named in said act, was duly published, that " a meeting of the petitioners for said act, and all other persons legally interested therein, would be held on the fourth day of June (then) next, at three o'clock in the afternoon, at the Lechmere House in Cambridge, in the county of Middlesex, for the purpose of accepting the said act, organizing the corporation, adopting a

code of by-laws, and transacting such other business as might come before them."

At said first meeting, a large number of those who had signed the said books of subscription, and who were not petitioners, were present, and claimed the right to take part in the organization of the bank, as associates with the persons named in the charter, and this they were invited to do by Messrs. Boynton and Kidder, two persons named in the act, the third (Mr. Houghton) not being present. On the other hand, it was contended by a portion of the petitioners present, that those only who had signed the original petition to the legislature, had a right to vote in the organization of the corporation. Whereupon, both parties proceeded simultaneously to effect an organization of the meeting, by making choice of different chairmen and clerks, and each voted to accept the act of incorporation. At this stage of the proceedings, those who claimed that the petitioners only had a right to take part in the organization, being nineteen in number, and a majority of petitioners present, voted to adjourn to an adjoining room, where they admitted new associates, and opened a new stock book, to which, including the petitioners, the whole subscription amounted to $52,300; and thereupon proceeded to organize the corporation, by choice of directors and officers ; and it was admitted that they duly effected a legal organization, if by law under the above facts, and the other facts found by the master, it was competent for them so to do.

The said Boynton and Kidder, and a minority of those who had signed the petition, together with those who were not petitioners, but had signed certain books of subscription, referred to in the master's report, all of whose subscriptions, amounted in the aggregate to $102,300, remained and duly effected an organization of said corporation, if by law under the facts herein stated, and those found by the master, they were competent so to do.

Nineteen of the original petitioners for a charter, when they signed the petition, were ignorant of the meeting at the Triton office when they signed the same—one of them never subscribed for stock—one did not subscribe for stock till after the

meeting called to accept the act—fifteen of the said nineteen who also subscribed for stock, were ignorant of subscription books for stock being circulated in Boston when they themselves subscribed for stock—and the same number signed the first memorial.

It was admitted that all the signatures in all the subscription books were genuine and *bonâ fide.*

The cases were argued before the full court on the master's report.

*R. Fletcher & O. H. P. Green,* for Lewis Hall and others, cited *Ellis* v. *Marshall,* 2 Mass. 269; *Rex* v. *Askew,* 4 Bur. 2199; *Lexington & W. C. R. R. Co.* v. *Chandler,* 13 Met. 315; *Day* v. *Stetson,* 8 Greenl. 365; *Penobscot Boom Co.* v. *Baker,* 4 Shepley, 233; *New Bedford & Bridgewater Turnpike Co.* v. *Adams,* 8 Mass. 141; 1 Mass. Special Laws, 225; 4 Ib. 366; *Taunton & South Boston Turnpike Co.* v. *Whiting,* 10 Mass. 335; *Gilmore* v. *Pope,* 5 Ib. 491; Angell & Ames on Corp. (2d ed.) §§ 13, 14, 15; *Bridgewater Academy* v. *Gilbert,* 2 Pick. 579; *Farmington Academy* v. *Allen,* 14 Mass. 172; *Limerick Academy* v. *Davis,* 11 Ib. 113; *Cabot & West Springfield Bridge* v. *Chapin,* 6 Cush. 15; *St. Luke's Church* v. *Slack,* 7 Cush. 226; *Bellows* v. *Hallowell Bank,* 2 Mason, 35; *Wallingford Manufacturing Co.* v. *Fox,* 12 Verm. 308.

*S. Bartlett & G. W. Tuxbury,* for Boynton and others, cited Ang. & Ames on Corp. §§ 98, 113, 517, 523; *State* v. *Tudor,* 5 Day, 329; *Overseers of the Poor* v. *Sears,* 22 Pick. 122; *Philadelphia Savings' Inst., Case of,* 1 Whart. 461; Rev. Sts. c. 36, §§ 22, 33; *Middlesex Turnpike Corporation* v. *Swan,* 10 Mass. 384; *Gray* v. *Portland Bank,* 3 Ib. 364; *Chester Glass Co.* v. *Dewey,* 16 Ib. 94; *Hamilton & Deansville Plank Road Co.* v. *Rice,* 7 Barb. 157; *Stanton* v. *Wilson,* 2 Hill, 153; *Kidwelly Canal Co.* v. *Raby,* 2 Price, 93; *Salem Mill Dam Corporation* v. *Ropes,* 6 Pick. 23; *Central Turnpike Corporation* v. *Valentine,* 10 Ib. 142; *Minor* v. *Mechanic's Bank of Alexandria,* 1 Peters, 46.

SHAW, C. J. These are not cases, as the titles would seem to import, of the same corporation against two parties, but exactly the reverse; each is instituted by a party of individ-

32 *

uals, claiming to be the true corporation, adversely to the other. The real question is, whether the company, of which Hall has been chosen president, is the duly organized corporation under the act, *St.* 1853, *c.* 241, being an act to incorporate the Lechmere Bank, in Cambridge, and entitled to enjoy the franchise, and exercise all the powers of a banking company, according to the laws of this commonwealth; or whether the company, of which Boynton has been chosen president, is such true and legitimate corporation. Taking the facts, as reported by the master, according to the agreement of the parties, it seems to us quite clear, that the proof of either party would be quite sufficient to establish a due and legal organization under the charter, but for the facts tending to establish a superior claim on the part of the other party. But as two different corporations cannot be legally organized and constituted under one act of incorporation, it is manifest that any proof, whether strong and decisive, or barely preponderating, which establishes the legality of the one, must necessarily negative the legality of the other.

The first question to be decided is, who are the persons incorporated? and this must depend, in the first instance, on a careful consideration of the charter, which is a grant by the government, by whose authority alone such franchise can be claimed, of the extent and limits of which, the act of the legislature is the sole authentic evidence. By the act of incorporation, Amory Houghton, Edmund Boynton, Frederic Kidder, their associates and successors, are made a corporation, &c. In acts of incorporation the term " associates " is ambiguous, and may have more than one meaning, and it becomes necessary to distinguish between the different classes, who, under the term " associates," may be members of a corporation. They may be either persons now acting with those named, and whom those named represent; or they may be persons, who may hereafter come in to be associates, and as such, members of the corporation. And in many of the old acts of incorporation, when the legislature were less sparing of words, the phrase was, after naming certain individuals, " those who have already associated, or may hereafter

associate with them." But although both classes might, in pursuance of the charter, become members of the corporation intended to be constituted, yet it would be by different modes and with different rights and powers.

It must be borne in mind, that the purpose of an incorporation, is to create an artificial person and body politic, to consist of a number of natural persons, associated and bound together by a name, which shall have identity and continuance, either in perpetuity or for a certain time, although every individual may change, and that frequently. But the act gives efficacy to the corporation thus constituted, not only at its outset but also during its whole continuance; it therefore confers these corporate powers, not only upon all those to whom the franchise is first granted, but upon those who, under the name of " associates," " successors," or " assigns," coming into these relations afterwards in the orderly way, provided by the charter and by-laws, constitute the corporation.

It is manifest, therefore, that the term " associates " may mean those who are already associated with the persons named, or those who may come in afterwards. The term "associates " may, therefore, in such an act of incorporation, have an appropriate place, although, used in this latter sense, it cannot mean persons intended as original grantees of the charter. The question now is, who were those original grantees, or, in other words, who were the persons to whom, by this description, it was intended to grant the franchise of being a banking corporation? We are not prepared to say that a grant may not be made to certain persons, by a certain and definite description, as well as by name, and when such words of description are used, it is always competent to go into parol or other evidence *aliunde*, to ascertain the person or thing embraced in the description. Even when a grant is made to one by name, and it turns out that there are two or more persons of the same name, it is in the nature of a latent ambiguity, and evidence *aliunde* is admissible.

In the first charter of a bank in this commonwealth by which the Massachusetts Bank was established, *St.* 1783,

*c.* 25, is an instance, where the grantees are designated partly by name and partly by description. It contains a preamble setting forth the advantages expected from a bank, and that many persons had subscribed thereto, and further, that William Phillips, and five other persons named, in behalf of such subscribers have applied for an act; it then proceeds to enact, that William Phillips and the five others named, togcther with all those who are, or those who shall become proprietors, &c., shall be a corporation. There, one subscription being definitely referred to, would be competent evidence, and would identify and distinguish the persons intended, as those on whom the franchise was conferred, as if they had been named.

So, if articles of association were drawn up and signed, by which they had agreed to unite in applying for an act of incorporation, and an act should be passed conferring corporate powers on two or three of the first named, and their associates, referring to such articles, this would make the articles evidence, and make the act apply to all the parties there named, conformably to the maxim, *Certum est, quod certum reddi potest.* The question in all such cases is, what the legislature intended; it is a question of the construction of their words. Even if the parties to the enterprise had an understanding between themselves, which was not communicated to the legislature, or not acted upon by them, either in the words of their act, or referred to in it by necessary or reasonable implication, such understanding cannot aid in construing the act.

Supposing, then, that others besides the persons named may be original grantees of the franchise and benefits of the charter, and evidence out of the act itself is competent to show who were included in this charter under the term " associates," the question recurs, whether signers of the books, who were not signers of the petition, are included.

Association *ex vi termini* implies agreement, compact, union of mind, and purpose and action. When, as above stated, it includes those who are to come in afterwards, either together with, or as successors to the original grantees, it is by a compact between the party who desires to come in,

on the one hand, and the corporation who consents to receive him, on the other. One of the powers granted is, to receive associates and provide for a succession of members. But the right to receive associates is a corporate right, to be exercised like other corporate powers, by a majority, if not otherwise regulated. But the exercise of a corporate right presupposes a previous corporate organization, and therefore, until such organization, there can be no such associates, and therefore no such one can act in the organization, although invited to do so by some, or even a majority of individual grantees. If, therefore, there are persons included in the act as grantees of the charter, under the name of " associates," they must be those who were actually associates, and could properly be designated, identified, and ascertained to be such, at the time of the passing of the act of incorporation.

We think it is clear, that the right to establish this bank was not conferred on the three persons named only; and it is not seriously contended that it was so. In this act, as well as in most others for establishing banks, passed at the same session, three persons only are named, even where the capital was $1,500,000. And in various other acts of incorporation, three persons only are named. And yet it is the manifest policy of the commonwealth, in granting banks, so important to the interests of the community, furnishing, as they practically do, the currency of the commonwealth, that the banking company shall consist of a large number of known and responsible persons, known to the legislature, in order that the best security shall be had that the currency thus to be furnished shall be a sound one. We think, therefore, that we may judicially take notice of a custom, adopted now for a number of years in the legislature, in granting acts of incorporation, to name the first three persons named in the petition, and to enact that they, their associates and successors, shall be the corporation. This expedient has probably been adopted with a view to shortening these acts as much as possible. Here the petition is before us, and it appears that though there are between twenty and thirty signers, the first three only are named in the act, followed by the words " their associates and successors "

From the evidence, the court are of opinion, that by the term " associates," after naming the first three, *primâ facie* the legislature intended those who were associated with them as petitioners.   We have already suggested, that by the natural import of the word " associates," is understood persons united, acting together by mutual consent, by compact, to the promotion of some common object.   The joining together, by signing and presenting one petition, for the promotion of one object, is the joint and united act of each and all the petitioners.   They describe themselves as inhabitants of East Cambridge, and pray that they may be incorporated for the purpose of establishing a bank at that place.   The prayer is not, that they and their associates may be incorporated,—not in behalf of themselves and others—these would imply persons other than the petitioners.   But the term " associates " is the language of the legislature, not of the petitioners ; and describes Houghton, Boynton, and Kidder, and their associates, the associates of the three.   The term is fully satisfied by making it apply to the petitioners, who in fact are associated with Houghton, Boynton, and Kidder, in petitioning for precisely such an act.   There is no intimation from any report or document, or from any evidence whatever, that the legislature intended to pass any other act than that prayed for ; it is manifest, we think, that this charter was granted in answer to that petition.   In quoting a similar act of incorporation, Parker, J. says that it was a grant or charter to the individuals who prayed for it, and those who should associate with them.

Is there any thing in the evidence before us to control and rebut this *primâ facie* presumption of fact ?   The party acting with Houghton insist, that the books, which were prepared at the same meeting of four individuals, at which the enterprise was first projected, and which were put into circulation at the same time, in different places, made those, who subscribed for stock on those books, associates in the enterprise, with those who signed the petition, and that those were the associates contemplated in the charter.   But we think this proposition cannot be maintained, for several reasons.

1. It is true that these books were prepared by the four per

sons, at a meeting, which was the germ of the enterprise, but they were to be circulated in different places ; those who subscribed one had no means of knowing who had subscribed others, and there was nothing, therefore, to make the signers of these different books associates with each other. And it is found as a fact, that most of the petitioners, when they signed the petition, did not know of these subscriptions. Had they all signed on the same book or paper, declaring the intended enterprise, it might have been regarded more plausibly as an article of association, and referred to by the legislature.

2. But the heading to their books, which was alike in all, did not amount necessarily, perhaps by its import not probably, to an agreement, to join in obtaining or procuring a charter for a bank ; but it was an agreement to take shares for the purpose of forming a banking association, to be established in East Cambridge, and to pay, &c. This might be fairly contended to be a provisional undertaking, to take shares in such a bank, when granted and organized, and in a condition to receive associates and fill up its stock. This undertaking, even if it is valid and binding as a contract, which is doubtful for want of consideration and reciprocity, would give them no power to act in the organization, or otherwise as associates and members of such corporation, until received as associates by the corporation when organized, after being qualified to act as a corporation. Until this is done, those only who are made members by the act of incorporation can be deemed capable of acting ; and as the act makes no distinction amongst its grantees, as to the number of shares they shall respectively hold, they shall have an equal voice and vote, as if each held an aliquot part of the whole stock, according to the number of grantees of the charter. But when organized, they may, and commonly do pass a vote, declaring how many shares each shall take, and this being entered on their books, which constitute the authoritative record of the doings of the corporation, shall be deemed a corporate act, and be conclusive

So, as they have the whole authority and property in themselves, they may share it with others, by admitting them to take shares, and thereby diminish their aggregate amount of

stock, *pro tanto* ; and if those others consent to it by becoming stockholders, this is also entered on their books, and they become members to all intents and purposes, with the original grantees.    They become associates *de facto* then, and within the terms of the charter, members.    *Gray* v. *Portland Bank*, 3 Mass. 364.

3.  The petitioners who ask for the grant, by their petition, ask it for themselves ; they recite the advantage to East Cambridge as a moving cause, addressed to the legislature, and describe themselves as inhabitants of East Cambridge; whereas if it had been intended that all the signers of the books, who were engaged to take stock, were intended and expected to be original grantees of the charter and franchise, and not to come in as takers of stock afterwards, there seems no reason why they should not have joined in the petition, and described themselves as inhabitants of East Cambridge and various other places.

4.  If we examine what took place before the legislative committee, it rather tends to strengthen the conclusion, that the legislature, by their act, intended the other petitioners, and not the signers of the books, as the " associates."

We had supposed it not usual to address memorials to a committee of the legislature, but that the proper course was, to address them to the two houses, and that through them they were sent to the committee.    But this informality, if it be one, is of no importance.    The first was signed by Houghton and others who had signed the petition, reciting their pending petition praying for a bank with a capital of $200,000, and now intimating that a capital of $100,000 would, for the present, accommodate the business of that village, and that it is desirable to have the proposed bank owned and managed by citizens of the place, they now ask for the smaller capital.

The signers of the counter-memorial, desiring the capital to be $200,000, according to the original petition, describe themselves as residents of East Cambridge.    Several of them were not signers of the petition, nor inhabitants of East Cambridge ; this, perhaps, is of no other importance, than that i implies a consciousness on their part, that the contemplated

bank was intended for the special accommodation and benefit of that place and its inhabitants, and that it should be so understood by the legislature.

The legislature, by granting the bank of the smaller capital, as far as this proceeding could have any effect, sanctioned the views of the petitioners.

We attribute very little force and effect to this evidence. In general it would be unsafe to go into the interlocutory proceedings before the legislature, to ascertain what they intended, by any act of legislation ; in general, the construction must be obtained from the words of the act, in reference to the subject-matter and the surrounding circumstances, and with due regard to other acts in similar cases. But, we think it quite clear, that these proceedings have no tendency to contradict or vary the construction which, on other grounds, we put on the act, nor to favor a different construction.

Some consideration, perhaps, may be supposed to be due to the fact, that the notice for calling the first meeting, signed by Amory Houghton, was addressed to the petitioners for said act, and all other persons interested therein, which includes persons other than the petitioners. But we think this circumstance of no weight.

This notice was not issued in pursuance of any provision in the act itself, for there was none, but under a provision in Rev. Sts. c. 44, § 3, which provides, that the first meeting of all corporations shall, unless otherwise provided for, be called by a notice signed by any one or more of the persons named in the act of incorporation. This was purely a ministerial act. His power and authority was, to call a meeting of the persons incorporated, and did not extend beyond. Any attempt to carry it further was wholly void. The persons thus incorporated were fixed by the act either by name or by description more or less definite, and the number could not be enlarged or diminished by the act of the person calling the meeting. If persons other than petitioners were not included in the act, the call for the meeting, whatever were its terms, could give them no power. For the same reason also, as before stated, an invitation by any other of the persons named in the act, or embraced as

associates, could not confer an authority to meet and vote, on others not embraced. If subscribers to books, not included in the petition, were included in the act, they needed no such invitation ; if they were not included in the grant, such invitation gave them no authority to vote.

Perhaps it may be said, that there are many instances in which, upon a similar call for a meeting to accept an act and organize a corporation, for establishing a bank, or other similar purposes, a meeting has been held, of all friends and promoters of the enterprise, without regard to the question whether *petitioners* or not, and that the validity of such organization has not been called in question. If it be so, which we think highly probable, it may be accounted for upon a very simple principle, that of the consent of those concerned. *Volentibus non fit injuria.* No objection being taken to the right of such persons, the vote is duly recorded as the vote of those entitled, and when stock is assigned to persons not petitioners, indiscriminately, with those who were, and entered on the books, it is the act of the corporation, under their acknowledged power, to receive associates. In the present case, the objection was taken in the outset, by those embraced in the petition, claiming alone to be existing associates, and the great majority of them refused to act with those not petitioners, thereby raising the question, Who were the associates and persons incorporated ? Their assent, therefore, is expressly disproved.

It is said that, upon this subject, the power of the legislature is unlimited, and that they may grant franchises, rights, and powers, to persons by a general description, though in some degree doubtful and uncertain ; and that in this case they might, by a change of phraseology, have granted this charter to all those who in any form had subscribed for stock. Courts of justice, we think, should be slow to believe that the legislature would grant powers and privileges so highly interesting both to public and private rights, to sets of persons designated by a description so doubtful and uncertain as to render it difficult to prove who are the persons intended as grantees ; nor should they put such a construction upon a particular

grant, unless the intent of the legislature is clear and explicit. But assuming that they have such power, and that in any particular case the persons intended must be ascertained and identified by the best evidence which the nature of the case affords; yet, we are of opinion, that they have not done so in the present case, and that, according to the preponderating weight of the evidence, the grant of a charter for this bank, was made to the three persons named, and those associated with them, in a prayer to the legislature, for a grant of such a franchise to them.

Perhaps this act is drawn with as much care and precaution as acts of incorporation generally are ; but it is matter of regret, that, in many acts of incorporation, there is room for great doubt and uncertainty on many grounds ; and it is rather matter of surprise, that there have not been more difficulties, rather than fewer, in organizing and conducting the business of corporations. One clause in the general laws, above cited, (Rev. Sts. *c.* 44, § 3,) authorizing any one of several persons named, to fix the time and place for the first meeting, on the regularity of which all its future meetings depend, seems to open a wide door for difficulties, especially when different parties in a corporation are struggling to gain an undue advantage. One might fix one time and place, and another a different one, several meetings and several organizations might be had, and it would be difficult to decide which would be regular, although it is certain that one of them only could be upheld. Perhaps, upon further consideration, the legislature may perceive the importance of providing, by more accuracy and precision in their enactments, against any such difficulty in future.

In all matters of grant, whether it be of property, or of franchises, rights, powers, and immunities, whether it be by private or public act, especially when great public and private interests are concerned, it is impossible to overrate the importance of certainty in designating the subject-matter of the grant, the objects and purposes for which, and the persons to whom it is made. Certainty is the father of right, and the author of peace. Uncertainty engenders doubt, and doubt leads to controversy, litigation and strife, which it is the best

purpose of all wise legislation and able and cautious jurisprudence, not only to adjust, but to prevent altogether.

A decree must be entered at the proper time and in due form, for a perpetual injunction against those who claim to act as the president, directors, and company of the Lechmere Bank, under the organization by which Edmund Boynton was elected president, and declaring the right of the company of which Lewis Hall has been chosen president, to all the rights and immunities granted by said act.

*Decree accordingly.*